**Pages 1 - 42**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
    VS.                             )        **NO. CR 22-00168 WHO**
                                    )
MIKLOS DANIEL BRODY,                )
                                    )
            Defendant.              )
_____ )
                          San Francisco, California
                          Thursday, February 16, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                      STEPHANIE M. HINDS
                      United States Attorney
                      450 Golden Gate Avenue
                      San Francisco, California  94102
                 BY:  **LAUREN M. HARDING**
                      **GEORGE HAGEMAN**
                      **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                      MORGAN, LEWIS & BROCKIUS LLP
                      1400 Page Mill Road
                      Palo Alto, California  94304
                 BY:  **MARK L. KROTOSKI, ATTORNEY AT LAW**

For First Republic Bank:
                      HANSON BRIDGETT LLP
                      425 Market Street - 26th Floor
                      San Francisco, California  94105
                 BY:  **BATYA FORSYTH, ATTORNEY AT LAW**
                      **ROBERT G. DAVIS, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

| | |
|---|---|
| 1 | **Thursday - February 16, 2023**                    **9:54 a.m.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  This Court is now in session.  The |
| 5 | Honorable William H. Orrick presiding. |
| 6 | **THE COURT:**  Good morning, everybody.  Please be |
| 7 | seated. |
| 8 | (Pause in proceedings.) |
| 9 | **THE CLERK:**  We are here in case number 22-168, United |
| 10 | States versus Miklos Daniel Brody. |
| 11 | Counsel, if you would please, come forward and state your |
| 12 | appearance for the record. |
| 13 | **MR. HAGEMAN:**  Good morning, Your Honor, George Hageman |
| 14 | and Lauren Harding for the United States. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. KROTOSKY:**  Good morning, Your Honor, Mark Krotosky |
| 17 | of Morgan Lewis on behalf of Mr. Brody who is present out of |
| 18 | custody. |
| 19 | **THE COURT:**  Good morning. |
| 20 | **MR. DAVIS:**  Good morning, Your Honor, Robert Davis and |
| 21 | Batya Forsyth for First Republic Bank. |
| 22 | **THE COURT:**  Great.  Good morning to all of you.  Let |
| 23 | me tell you how we are going to proceed this morning. |
| 24 | I'm going to give you my tentative on the motions to |
| 25 | dismiss and the motions to suppress.  I'm going to then give |

1  you each 15 minutes to address whatever it is in those -- in

2  that tentative or in those motions that you think is most

3  important, and then we will move on to the motion to compel.

4      I have some direct questions that I want to ask of the --

5  of First Republic and then I will give you each 15 -- after I

6  get the answers to those things, I will give you each 15

7  minutes.

8      So let me tell you -- I will give you my tentative on the

9  motions.  With respect to the motion to dismiss Count Two, it

10 doesn't appear to me to be duplicitous.

11     There is one violation of Section 1030(a)(5)(A) with two

12 elements, transmission and damage.  The acts of transmission

13 are not distinct elements, and a different means of violating

14 the statute does not mean that they are distinct offenses.

15     And I don't see any case law to the contrary.  I don't

16 think *U.S. v. Aguilar* is on point there.  The statute stated

17 two distinct offenses and was duplicitous on its face.

18     I also -- I don't think specific unanimity is required.

19 The theories of liability are not the same as different

20 elements or offenses.  I will look at -- you can raise this

21 again at the final instruction conference.  If there is

22 something in the evidence that makes me think that I'm thinking

23 about this incorrectly, I will look at it again; but I'm -- at

24 the moment I just don't see it.

25     With respect to the motions to -- the *Franks* motion, again

1    I'm inclined to deny that motion.  I don't see a material

2    misrepresentation or misleading statement nor that anything was

3    recklessly made.

4        The UDID diagram was illustrative of how the user name and

5    UDID were tied together.  So failure to include the date and

6    time isn't material, and it wasn't used to prove access by

7    Mr. Brody.

8        The affidavit, I think, lays out the timeline on

9    March 11th and 12th; and there is no substantive preliminary

10   showing regarding the UDID diagram or statements that they were

11   made recklessly.

12       I think the same -- my same thought process applies to the

13   subsequent activity statements.  The IP address was associated

14   with the residence.  And whether he, Mr. Brody, used it or not,

15   the association supports Agent Foss's good-faith belief that

16   probable cause existed for the search.  The IP address was used

17   44 times between 7:43 p.m. on March 11th and March 12th.

18       And then whether others were online or not doesn't impact

19   the probable cause that existed for the search in my view, so

20   stating that wasn't necessary.

21       With respect to the motion to suppress the evidence

22   seized, again, I would deny it.  I think there is a nexus

23   between the residence and the computers and the electronic

24   device.  The police report that Mr. Brody made was suspicious

25   enough to support the search for the items that were alleged

1   stolen.  I don't -- I don't find that this was a stale search

2   because the digital devices wouldn't be affected by the passage

3   of time.  I don't think the warrant was overbroad.

4        It seems sufficiently particular and the scope of the

5   search doesn't -- wouldn't support suppression.  And in any

6   event, I think the good-faith exception would apply.

7        So that's the -- that's my view on those motions.  So,

8   Mr. Krotosky, please proceed.

9              **MR. KROTOSKY:**  Thank you, Your Honor.

10       I would like to turn first to the motion to suppress.  We

11  believe that the allegations in the affidavit, looking solely

12  at the four corners of the affidavit, that they establish

13  essentially that Mr. Brody was a suspect.

14       It was one year earlier that they knew what his target

15  residence was and that the IP address one year earlier does not

16  connect at all to the residence.

17       Now, what's important about the IP address is that it does

18  not connect also to FRB.  So its activity -- it is like having

19  a telephone and there is a telephone record, and there is no

20  calls made during the time of the offense; but there is calls

21  made before or after.

22       And so here we believe that the IP address that was listed

23  that is associated clearly does not show a connection to the

24  FRB network.

25       So if you take that out, if you remove that fact by

focusing on what it shows -- because it essentially says that

there is no nexus or a computer activity at the residence.  The

only thing they have is the IP address and -- but it is before

and after the intrusion.  So there is nothing, you know, else

at the residence.

So what that leaves is that Mr. Brody was a suspect.  And,

you know, they had their reasons for whatever they thought; but

under the *Ramos* case, being a mere suspect does not allow for

the search of a residence including the contents of that

residence.

The other cases that are cited including the *Kvashuk* case

that the Government relies on had more specificity and a nexus

or justification to the residence.

So the only thing that shows any activity is the IP

address.  The state in itself says not during.  It is before

and after and then, you know, whatever the association is,

which is not stated.

What that means is that one year before Mr. Brody was

known to have resided at that location and he is a suspect, but

there is nothing that shows that there is likely to be evidence

that will be found, you know, at the residence.

The --

**THE COURT:**  Why wouldn't that be the logical place

where the devices would be?  If they weren't at his place of

work, which they weren't because he was no longer there, where

1    else -- where else would they be?

2    　　　　**MR. KROTOSKY:**  Well, you know, an IP address can

3    connect at a coffee house, at a library, at any location.

4    　　　　**THE COURT:**  Sure.

5    　　　　**MR. KROTOSKY:**  But there's -- again, he is a suspect

6    and you need more.  It's not one year later that, you know, the

7    material would still be there at that time.

8    　　　So it's a very thin inference and one that -- you know,

9    the concern is the comparable search warrants like this where

10   an individual is a suspect and where they are charged with

11   Computer Fraud and Abuse Act means that the Government can just

12   go into their residence one year later without any nexus or

13   justification.  And so for that reason we think that, you know,

14   the suppression is warranted.

15   　　　Now, with respect to the particularity, we did cite to *Koh*

16   and other cases where -- there is a whole line of cases

17   including in *Koh* where they talk about seizing computers and

18   records, just a broad search.  And that's basically what we

19   have here because in the items to be seized, attachment B, the

20   first paragraph just says "go grab data."  And there is nothing

21   about the bank.  There is nothing about time.  There is

22   nothing -- there is no particularity at all.

23   　　　And it just says "seize all computer systems, digital

24   storage media, iPhones and other, you know, items."

25   　　　The first time any name is mentioned is in the fourth

1  paragraph of items to be seized where it references Mr. Brody

2  and it says the supposed automobile burglary; but there is

3  nothing to guide the agents on this.

4      Now, here is what is important is in the Government's

5  opposition they did provide some affidavits including of

6  Special Agent Pritchard and she says: "I was familiar with the

7  case. I had already been debriefed on it, and I was aware of

8  the circumstances;" and she was the lead agent during the

9  search and "when we went in, we found the Route 66 keys."

10     Now those are mentioned in the San Francisco police

11  report. They are not mentioned in the affidavit. So this

12  shows that the agents are using external factors -- nothing

13  that is guiding their discretion -- in the search on what they

14  are going to seize and so -- but on the particularity

15  requirement, you know, as we set forth, there is also the child

16  porn search, which clearly was not authorized. The Fourth

17  Amendment is violated as soon as the search is run.

18     And here --

19     **THE COURT:** The fact that nobody looked at it doesn't

20  bother -- is irrelevant as far as you are concerned. So the

21  way that the Government looks at the computers in every case

22  would be a violation of the Fourth Amendment; is that right?

23     **MR. KROTOSKY:** It is, Your Honor, because the search

24  occurs in the operation of the program. That's what is very

25  important.

1        Now, you can have a further search and seizure by looking

2   at it but more importantly as Mr. Vasiliou says in his

3   declaration, there are other ways to obtain the volatile data,

4   which is what they were looking for.  You don't have to violate

5   the Fourth Amendment to obtain this.

6        They have other tools and other means to do it but this

7   task force officer apparently is accustomed to doing it in this

8   manner.  So, we do think that's a very significant, you know,

9   issue that stands out; but on the particularity, we think the

10  line of cases that we cited are very similar and they go back

11  for many decades.  And there is no particularity -- there is no

12  names mentioned.  The bank is not even mentioned.  There is no

13  dates mentioned, nothing to guide the discretion, you know, of

14  the searching officers other than what they are aware of as

15  they admit in the declaration.

16       And that's very troubling that a search warrant would be

17  obtained without any guidance.  And so we do think that those

18  cases, you know, do control with respect to the particularity

19  requirement.

20       Then on the *Leon* exception, again, we believe that there

21  are three separate bases.  The Government has the burden to

22  establish the Leon exception.

23       There is the facially deficient -- again, Special Agent

24  Pritchard admits in her declaration she is aware of other

25  factors.  She is not being constrained or guided by the search

1   warrant affidavit.  She is being directed by these other

2   factors that she is aware of the case.

3       And so we believe that that does establish -- that the

4   exception does not apply there.  We also believe it is lacking

5   in indicia of probable cause because one year later the only

6   thing is they know where he lives based on police report, based

7   on his known employment address.  The IP address is before and

8   after.  There is no nexus to the residence.

9       So what this search warrant basically says, it violates

10  the *Ramos* holding and the other cases which do specifically

11  require a nexus and justification.  And each of those cases, as

12  we cited in our brief, do set forth IP addresses or known views

13  of the individuals at the residence or seeing them at the

14  residence as well.  And none of that is here.

15      And so this search warrant would stand for the proposition

16  that if you are a suspect and you are charged with the Computer

17  Fraud and Abuse Act, one year later the Government may be able

18  to break the door and go and seize, you know, all of the data.

19      I will move on then to the *Franks* motion.  And with

20  respect to the *Franks* motion, we believe that a -- by a

21  preponderance of the evidence, a substantial showing has been

22  made that the affidavit recklessly or intentionally either

23  omitted facts or made material misrepresentations.

24      Now, paragraph 11 is the UDID paragraph.  It is the only

25  one that mentions UDID.  It provides one ten days -- eleven

1    days before the search, and it cuts off the information.

2        We believe that a magistrate judge would want to know is

3    this the only UDID that you have?  And why is it -- does it

4    predate the search?

5        Now, as you said, Your Honor, it is illustrative and

6    that's the misleading component is because it presumes that

7    each and every other computer activity in the search warrant

8    affidavit is backed up by a UDID and it is not because there is

9    one on -- there is none on March 11th, and there is one on

10   March 1st, and there is one on March 12th.

11       The problem with the March 12th one, the Government relies

12   on the telephone record which has the same UDID, which is for

13   the iPhone 6.  And that should show up on the phone record and

14   that does not.  And, again, that is another significant red

15   flag and discrepancy that the magistrate judge should have been

16   made aware of.

17       So, with all of that information, you have a UDID that

18   predates the search -- I'm sorry -- that predates the offense,

19   and then you have a node of UDIDs on March 11th including --

20   for this illustrative example in paragraph 11 -- it says at

21   7:16 p.m. there is no UDID for that.  It just doesn't exist.

22   And then there is one on March 12th, but it is inconsistent

23   with other evidence.

24       Based with those facts, a magistrate judge could have

25   exercised independence and asked, you know, "what do you have

1  that connects any devices to the bank, you know, for this?"

2      So the failure to include that information was, you know,

3  misleading we believe at best.

4      Now, with respect to the computer activity, the

5  allegations say Brody did A, B, C, whatever the computer

6  activity is.  And then what we learned in the motions is that

7  that's based on user dbrody, but we also learned that there is

8  no UDID for each of those computer activity that is listed.

9      And so the fact that there is no UDID means it could be

10  someone else who got in to use the dbrody account.

11      As Mr. Vasiliou says in his declaration, the mere use of

12  an account does not identify the user.  You can have shared

13  circumstances or someone could have obtained that, and he also

14  says that it's not uncommon in an intrusion case that multiple

15  accounts will be used during the course of an intrusion.

16      And so for that reason the other activity is unsupported

17  and it was misleading to say Brody did this when the only basis

18  is the use of the Brody account.  It should have said:  We

19  believe that it is the dbrody account and here is why we --

20      **THE COURT:**  It could have said the Brody account.

21  That's true.  It could have said that.

22      **MR. KROTOSKY:**  Well, they could have said it but then

23  there is another step.  As Mr. Vasiliou says, forensically the

24  mere use of an account does not identify the person.

25      And so it would have then flagged that issue and the

1    magistrate judge would have had an opportunity to address that.

2         With respect to the IP address, again, what we learned

3    from the telephone record is -- has no connection, you know,

4    with any activity.  It doesn't show location.  It doesn't show

5    that it's coming from the residence.  It just shows activity;

6    however, the IP address also is inconsistent with the activity

7    that's alleged.

8         It says:  This IP address was used before and after the

9    intrusion, and you would expect to see if it is associated with

10   the residence that it was also used, you know, during the

11   intrusion and that information, you know, is not, you know,

12   provided there.

13        I'm sorry, Your Honor --

14                   (Pause in proceedings.)

15        **MR. KROTOSKY:**  The other thing, Your Honor, with

16   respect to the *Franks* motion is that, as set forth in

17   paragraph 11, there is a registration process that occurs.

18        And so it has got to match either the device of an

19   iPhone 6 here, and it has got to match with another computer.

20        And what we have here is there are no UDIDs that apply,

21   you know, during the intrusion other than the one on

22   March 12th, which is inconsistent with the phone record; and we

23   also have no VPN log activity, which is another way to identify

24   access to the system.

25        And for those reasons, you know, we believe that the --

1   the requisite showing has been made and that the magistrate

2   judge, which presented an affidavit that did not in full candor

3   include additional information -- and, you know, one of the

4   things I wanted to mention is that, you know, when the affiant

5   mentions a particular fact like the UDID, candor is very

6   important.

7        If it is illustrative, it has to apply across the board.

8   And where they mention a UDID and it's, you know, on March 1 --

9   it proceeds the intrusion -- that lack of candor deprived the

10  magistrate judge of the information; and she was led to believe

11  that the -- it applied for each and every instance of the

12  computer accompanied activity.  And the fact that it did not is

13  something that, you know, we believe should have been disclosed

14  in the search warrant.

15           **THE COURT:**  All right.

16        **MR. KROTOSKY:**  And then, Your Honor, with respect to

17  the duplicity motion.

18           **THE COURT:**  Well, you are -- you hit your 15 minutes,

19  so give me a minute.

20        **MR. KROTOSKY:**  Okay.  Very good.  Your Honor, we think

21  the controlling cases here are *Bonds*, *Bonnar* and *Newell*.  Those

22  three cases deal -- show that distinct acts are involved, and

23  for that reason it's not an alternative means of proof.

24        In this instance we have distinct acts for different parts

25  of the network.  We have the Terraform.  We have the GitHub.

```
 1   We have Ansible Tower.  And we think that those three cases
 2   very carefully reviewed it, and we believe that that applies.
 3   And, you know, we will -- also as the Court considers the
 4   unanimity.
 5         Now, the Government is not opposed to a unanimity
 6   instruction, you know, if the Court was inclined to view those
 7   as distinct acts.  We believe that they are, and we believe for
 8   those reasons a unanimity instruction is required.
 9              THE COURT:  Okay, thank you.  Mr. Hageman.
10         MR. HAGEMAN:  Your Honor, if the Court would allow,
11   Ms. Harding will argue the first motion to suppress and then I
12   will --
13              THE COURT:  I will allow Ms. Harding to argue, of
14   course.
15              MR. HAGEMAN:  Thank you, Your Honor.
16         MS. HARDING:  I will try to keep it brief.  I just
17   have three responses to Mr. Krotosky's arguments on the motion
18   to suppress, none of which I think support that the Court
19   should reverse its tentative decision to deny the motion.
20         Mr. Krotosky talks about the IP address and takes great
21   issue with the fact that we didn't connect the IP address of
22   the residence to the network intrusion during the offense.
23         Just for the record, the affidavit does explain how --
24   through a network diagram, how Mr. Brody used internal IP
25   addresses associated with his laptop to access FRB's network
```

the night of the intrusion.

But more generally, this singular focus on the IP address allegation overlooks the many other allegations that should be considered under a totality analysis; the motive to commit the crime because he thought he was unjustly fired, the opportunity to commit the crime because he still had the Macbook, the logs that showed his user name logging into the device or logging into the system, rather, and the suspicious police report, all -- even notwithstanding the IP address allegation -- support a fair inference that Mr. Brody was much more than a mere suspect but that he, in fact, committed the network intrusion.

And to that point, the 2002 -- 2022, rather, *Kvashuk* case I think is on all fours here.  I think that supports where there is a computer-based crime searching other electronic devices as the agents did here is reasonable, and it's also reasonable to believe that people carry their personal electronic devices in their homes.

In the *Kvashuk* case you will recall that the Defendant even moved and moved homes since the Microsoft break-in, yet there was still probable cause to believe that the Defendant there took his devices with him.

On the particularity analysis, for the first time in reply, I just want to briefly respond to the *Koh* case that is cited in reply.  That is distinguishable in my view because it

1    actually -- it actually talks about how none of the fourteen

2    categories of seizable documents were limited by any reference

3    to any criminal activity.

4         And there is -- that's not the case here.  There was a

5    reference to the statute and the case law is good on that

6    point; that that's enough of an objective limiting factor.

7         And my last point is just on good faith.  So Agent

8    Pritchard's affidavit, I think, supports that she was guided by

9    her own judgment, which the *Adjani* case supports, is one

10   consideration when looking at good faith.

11        And there were objective limiting factors in attachment B,

12   but the Agent's actions here also support they were guided by

13   objective limiting factors; were looking for evidence of the

14   crime; were time limited in their scope of the searches on

15   Mr. Brody's devices.  So good faith is a second alternative

16   basis to denying the motion.

17            **THE COURT:**  Okay.  Thank you.

18            **MR. HAGEMAN:**  Your Honor, turning to the *Franks* motion

19   and the arguments that the Defense just presented, I think the

20   Court hit the nail on the head.  There is a standard here that

21   the Defense has to make a substantial preliminary showing of

22   both of these prongs, and they have failed to do so.

23        With respect to the U-D-I-D or UDID paragraph, the point

24   of that paragraph, as it states in the paragraph itself, is

25   that the multifactor authentication device and the user named

1    were tied together.  The date and timestamp on the UDID

2    information, that doesn't change that fact.  A UDID is a static

3    serial number -- like number.  And so the exact date and time

4    does not matter.

5         So it is not a false or misleading statement.  It is also

6    not intentionally or recklessly made.  The fact that there was

7    a March 12th UDID printout that the affiant could have used,

8    I believe, speaks to the lack of intent or recklessness here.

9         He did not include it because it, frankly, doesn't matter.

10   The UDID printout is not the lynchpin that the Defense seems to

11   be characterizing it as.  It is just one piece of the puzzle to

12   show that Mr. Brody had access.

13        If the UDID paragraph were the only paragraph in the

14   affidavit, perhaps, there would be a problem; but it's not the

15   only paragraph.  There is many other paragraphs in there.

16        As for the subsequent computer activity paragraphs, I will

17   be very brief on that because it stems from the same acts as

18   the UDID.

19        Again, if that were the only paragraph -- excuse me, if

20   each paragraph were to be addressed individually standing on

21   its own, perhaps, there would be a problem; but an affidavit

22   should be read based on the totality of the circumstances.

23        So we have not only the UDID, which shows Mr. Brody's

24   ability to access the system.  We also have the motive

25   established from his termination, his suspicious activity

1   regarding the Macbook afterwards, and all the other information

2   that in the totality of the circumstances viewing based on

3   common sense supports that Mr. Brody, Daniel Brody, is the

4   person between the dbrody user name.

5        And lastly with respect to the IP address, the Defense

6   said that it -- the information doesn't show that the network

7   intrusion is coming from the residence.

8        I believe there is substantial evidence in the affidavit

9   to support that the network intrusion happened from the

10  residence; but even if we were to take that out, the key

11  question is whether evidence of the crime is found at the

12  target residence.  That's the question that matters.

13       And so even if the evidence doesn't support that the

14  intrusion is coming from the residence, there is still enough

15  to support probable cause that evidence would be found at the

16  residence.

17       The Apple printout shows, as the Court noted, repeated

18  activity from the 157 IP address associated with that

19  residence.

20       Turning to the duplicity motion, the Court -- the Defense

21  cited three cases.  None of those cases are binding here.  Two

22  of them are district court cases.  One of them is an

23  out-of-circuit case.

24       I will focus on *Newell*, the out-of-circuit case from the

25  First Circuit.  In that case the activity that was duplicitous

1  spanned one year, which is a far cry from what we have here,

2  which is over approximately 15 hours -- that happens to span

3  two days because it began late in the afternoon and continued

4  to the next morning -- all one course of conduct all against

5  the same victim.

6       This situation is entirely different from the *Newell* case.

7  These are different means to commit the same underlying

8  offense.  The count is the same.  The element is the same.  The

9  mens rea is the same.  The punishment is the same.

10      So long as the jury finds unanimously that the element has

11  been met, there is no duplicity problem.  There is no need for

12  a specific unanimity instruction.

13          **THE COURT:**  Thank you, Mr. Hageman.  I will give you

14  two minutes, Mr. Krotosky, to say anything and then we will go

15  onto the next.

16          **MR. KROTOSKY:**  Thank you, Your Honor.  So with respect

17  to the motion to suppress, on the IP address.  Again, there is

18  no connection during the FRB intrusion, and it is not

19  reasonable to assume the IP address, you know, what the

20  location is.

21      With respect to the other allegations, you know, at the

22  residence, again, this is one year earlier; and the cases

23  require a nexus or justification that's been -- I'm sorry --

24  specifically identified in other cases.  That is missing here.

25      And he is a suspect.  The fact that it is a computer-based

 1    crime does not allow under the Fourth Amendment them to go in

 2    one year later.

 3         And with respect to the *Franks* issue, the UDID is a form

 4    of authentication; and there are only two examples that are

 5    provided.  One is March 1 and one is March 12th.

 6         It does not align with the Apple telephone record.  That

 7    is a big inconsistency and it should because it is the same

 8    UDID on the Apple record.

 9         Now, the fact that there are 44 other ones helps establish

10    the point that the Magistrate should have been told that those

11    times don't align and many of them occur within one minute.

12    There is, like, 10 or 12 within one minute, which suggests that

13    is an automatic refreshing that is going on.

14         More importantly, it does not correspond with the FRB

15    network.  The subsequent computer activity, again, we know for

16    a fact there is no UDID, you know, for each of those, you know,

17    as well.

18         And then finally on the duplicity, we do believe that the

19    *Bonds* and *Bonnar* case do apply very similarly.  Other district

20    courts confronting comparable situations have found there is

21    duplicity.  With that, we would submit it.

22         **THE COURT:**  Thank you.  All right.  Let's move on to

23    the motion to compel.

24                    (Pause in proceedings.)

25         **THE COURT:**  Let me just lay out sort of my background

1    context for how I'm thinking about this, and then I do have the

2    specific questions for you about a couple of these subpoenas.

3        In general, the Government has provided months ago the

4    documents that it intended to use from First Republic.  First

5    Republic has provided 90 gigabytes of data.

6        In large part I agree with First Republic that the

7    requests are -- that are still outstanding are overbroad and

8    fail under the *Nixon* standard and I accept their responses that

9    state -- where they state that they have produced all of the

10   responsive documents.  Most of the requests seem like sort of

11   quintessential fishing expeditions questions, but I do have

12   some specific questions.

13       So, first, with respect to subpoena number 1, request

14   number 2, which is the Apke network activity --

15           **MR. DAVIS:**  Yes, Your Honor.

16           **THE COURT:**  -- there are documents showing that --

17   showing people from First Republic Bank and Secret Service

18   Agents discussing material relating to the VPN.

19       The First Republic says that there is no VPN, but those

20   documents show them discussing something.  So whatever -- it

21   seems to me that the Bank ought to produce anything that is

22   referred to in those documents especially those relating to

23   Mr. Apke's activities on March 11 and March 12.

24           **MR. DAVIS:**  Yes, Your Honor.  And just to clarify, our

25   position is not that the Bank did not have a VPN.  It's that at

1   the time of the incident, the Bank did not have the VPN

2   configured in a way that the logs were being retained.

3        That has now since changed.  The Bank is doing that.  As

4   we have said multiple times in our responses, in our

5   opposition -- after the status conference, I e-mailed

6   Mr. Krotosky specifically to tell him this -- that there were

7   no logs -- no VPN logs at the time of the incident.  We cannot

8   produce them because the Bank -- it was not the practice of the

9   Bank to retain VPN logs.

10        I do acknowledge that there are references in some of the

11   communications to the VPN.  Many of them are mostly at the time

12   of the incident saying "here are examples of things that we

13   should try to retain."  One of them being VPN logs.

14        They were saying, you know, we should look for these

15   things; but the fact of the matter is they did not find them

16   because at that time the Bank did not have VPN logs.

17        **THE COURT:**  So are you saying that you have searched

18   for all of the documents that are referenced in the FRB and

19   Secret Service Agent communications and they don't exist?

20        **MR. DAVIS:**  Absolutely, Your Honor, yes.

21        **THE COURT:**  Okay.  All right.  Subpoena number 2,

22   request number 8, which relates to the GitHub servers.

23        **MR. DAVIS:**  Yes, Your Honor.

24        **THE COURT:**  Okay.  So, have you produced -- it would

25   seem like the GitHub direct access logs could be produced from

1    GitHub.  Has that been done?

2            **MR. DAVIS:**  So for the GitHub access logs, Your Honor,

3    we did -- we produced the application logs.  As to the access

4    logs, the issue here is that -- the way that the Bank uses

5    GitHub is a -- excuse me -- it is a -- it's an online

6    application.  It is a black box to the Bank.

7        So, they don't have access to these things.  These are

8    things that maybe could be obtained from GitHub.  The way the

9    bank uses GitHub is the same way I use Gmail.

10       I'm not privy to the logs that an online application

11   retains because the Bank is a user of the service, and they

12   don't have -- we don't have anything beyond what we have

13   provided.

14           **THE COURT:**  Okay.  Subpoena 2, request number 15,

15   which is the Terraform Enterprise application logs.

16           **MR. DAVIS:**  Yes, Your Honor.

17           **THE COURT:**  Here you have indicated that you have

18   produced these documents.  Is there an easy way for you to

19   point to the Defendant where those documents are?

20           **MR. DAVIS:**  I believe we could identify the file path,

21   Your Honor.

22           **THE COURT:**  Okay.  I would like you to do that.

23           **MR. DAVIS:**  Yes.

24           **THE COURT:**  Subpoena 2, request number 19, which is

25   the Terraform administrative console and dashboard.

1              **MR. DAVIS:**  Yes, Your Honor.

2              **THE COURT:**  Where -- were these documents located on

3    the TFE server?  And is the hash core support bundle on a

4    different server?  It kind of looked like you might have been

5    talking -- you were ships passing in the night on this.

6              **MR. DAVIS:**  So, we produced the entire Terraform

7    Enterprise server, which includes all of the aspects that the

8    Defense is requesting here.  So --

9              **THE COURT:**  So were the -- so there weren't documents

10   on the hash support bundle that were responsive to the request

11   then?

12             **MR. DAVIS:**  That's correct, Your Honor.

13             **THE COURT:**  Okay.  And did you provide documents from

14   that hash core support bundle just so that I'm clear?

15             **MR. DAVIS:**  I would have to look into that

16   specifically.  What we produced was a large encrypted drive.

17   It is hard for me to say off the top of my head what's in

18   there.

19        All I can say at this moment is that in request to

20   subpoena 2, request 19, we produced the entire server including

21   the entire system logs.  And that's what we have that is

22   responsive to that request.

23             **THE COURT:**  Right, yeah.  What I was thinking was that

24   the HashiCorp thing would -- support bundle was on a different

25   server.  And so if it was on a different server, it's not

```
 1  obvious to me that you did produce all the documents, but maybe
 2  you did.  I just don't know the answer to that.
 3          MR. DAVIS:  If we have them, we produced them.
 4          THE COURT:  You are saying that very confidently.
 5          MR. DAVIS:  I am very confident.  I have gone through
 6  this very many times with the client, and I'm very confident
 7  that what we have that is responsive to these requests has been
 8  produced and is in the encrypted drive.
 9          THE COURT:  Okay.  And then finally subpoena 4,
10  request number 6, transmissions involving GitHub.
11          MR. DAVIS:  Yes, Your Honor.
12          THE COURT:  Here I'm wondering whether -- if the
13  records were produced did -- did you point the Defendant to the
14  wrong folder?  What's the --
15          MR. DAVIS:  No, I don't believe so.  We provided
16  everything that we had, all the records that are related to the
17  damage to GitHub and the -- I don't believe that we
18  misidentified the folder name.
19          THE COURT:  Okay.  Mr. Krotosky, you have got 15
20  minutes.  Tell me what's important.
21          MR. KROTOSKY:  Okay.  Thank you, Your Honor.
22      So on the motion to compel, this implicates Mr. Brody's
23  constitutional rights to prepare his defense as well as the
24  jury's right to consider evidence.
25      Now, I know there has been reference made to this
```

90-gigabyte hard drive.  It doesn't matter if it is 5 or 10

terabytes.  If it does not have the activity of Mr. Apke and

the other users on the network, then Mr. Brody cannot defend

Count Two, which is the transmission of a command program or

code.

     Now, what has happened here is the Government did provide

what they had, but it was very limited.  It was only on one

user, Mr. Brody.  And in a network intrusion case, all network

activity is relevant with respect to the intrusion.

     One of the questions we have been asking from the

beginning is how many users were on this network during the 17

hours that's alleged for the intrusion.  We have never had an

answer for that, and we still don't know.  We don't have the

records.  Those records would provide a complete defense to

Mr. Brody.

     Now, one of those users is Alex Apke, and we have

requested a number of his documents.  He actually mentions in

his e-mail of March 12th, 2020, some gaps that need to be

followed up.  And that's one of our requests that we made, and

we have never received that evidence.

     That evidence -- because he says, for example, there is an

EFS function that overwrites commands.  And he says (as read:)

"this is going to be difficult to obtain because of this

overriding of the commands."

     And that's the whole point.  We cannot defend a case that

1    alleges a transmission of a command, a program, a code or

2    information without that evidence.  And those records would

3    provide a complete defense.

4         Now, Court was referring to the HashiCorp bundle, and that

5    is FRB record 001.  There is two references in this document.

6    First of all, it is cut off.  It is incomplete.  It was printed

7    on August 29th, 2022.

8         We have requested a substitute copy and we were told "We

9    have given you what we have.  We can't give you anything else."

10        If this is the state of it -- it also refers to two

11   bundles.  Those bundles existed.  And that goes to the heart of

12   the Court's question about the bundles.  They existed because

13   they were transferred in this record.

14        We have requested those bundles in the subpoena that the

15   Court just alluded to as well as in subpoena number 1, request

16   number 1.  Without those bundles, which we believe -- the date

17   says two years.  We have also asked for clarification of the

18   date.  Is it two years from the date of printing, August 29,

19   2020 or was it on March 12th, 2020?

20        We have asked and we have been given the same answer here.

21   "We gave you what we have.  We can't tell you anything more.

22   So you have what we have and that's it."

23        This is going to be confusing and very -- you know, for

24   the jury on these types of issues; but more importantly, they

25   go to the opportunity to establish a complete defense for

1  Mr. Brody.

2       So the bundles requested in subpoena number 1, request

3  number 1, are essential.  Without them, Mr. Brody is foreclosed

4  from -- from his defense in this case.

5       Now, it is more than his opportunity to prepare.  The

6  cases that we cited say that a jury must consider the evidence

7  concerning these matters.

8       And if we don't have the answer, whether these things

9  exist or they do not, that does not allow the jury under the

10  Sixth Amendment to consider fairly the evidence.

11       Our view is that the limited collection of data by FRB and

12  by the Government only focused on one person.  It is like

13  having a mansion as a house and they only went and looked at

14  the upper master bedroom.  They disregarded the whole house.

15       And without knowing the crime scene, what happened in each

16  of the rooms where there were multiple people or users in, we

17  cannot defend this case.

18       And so it doesn't matter if it is 90 gigabytes or, you

19  know, 5 or 10 terabytes, without the evidence of the other

20  activity of the users and Mr. Apke, our defense, you know, is

21  foreclosed with respect to that.

22       The -- many of the other requests go to the user activity.

23  Now, each of the subpoenas was carefully focused on known

24  records; and one of those is what has been referred to the 29

25  computers and servers.

1    So, the subpoenas said:  "Please produce all jump box

2 records and DevBox records."  We didn't know how many there

3 were; however, on November 11th when we received the 90

4 gigabyte hard drive, we learned for the first time the names of

5 some of these matters.

6    And so we tried to meet and confer with Mr. Davis and he

7 said -- the first time they were available was on

8 November 29th.  During that meeting, as we articulated in the

9 declaration and the attached e-mails to the motion requesting a

10 status conference, Mr. Davis said:  "You have what we have.  I

11 can't go through every single item."

12    So there was no opportunity.  So why that's important,

13 there are 29 computer servers and other devices; and we only

14 have maybe five of them.

15    And so in that mansion we are forced to defend on one

16 bedroom, and in a network intrusion case we have very limited

17 evidence about the activity.

18    And so what happens is those 29 boxes, they go through a

19 series of jump boxes or DevBoxes and then they get to the

20 Terraform, Ansible Tower or GitHub.  We don't have those

21 transmissions.  And without that evidence, Mr. Brody cannot

22 defend himself on this.

23    Now, we know they exist because we found the names, and

24 that's when we -- when we said "give us all the jump boxes," we

25 assumed that's all we would get but we didn't.  We got very

circumscribed evidence which has created a bias, misleading and incomplete investigation in this case.

We believe the only place to go and get these network records is FRB. And without them, Mr. Brody cannot fairly defend himself in this matter.

We have articulated since July in the continuing proceedings for Rule 17 the bases for each request. We have identified with specificity each one, and we have given specific examples in our filings as to the need here, and we believe here that without the requested records, Mr. Brody will not be able to fairly defend himself in this case.

**THE COURT:** Mr. Davis.

**MR. DAVIS:** Thank you, Your Honor.

First, I would like to just respond to the Defense's argument about the limited nature the production.

For a lot of the things that we produced, it was not limited to Mr. Brody. It was the home folders for the entire server. We also produced entire servers.

But the fact of the matter is at the time of the incident, the Bank performed an investigation. They determined that Mr. Brody was the person who caused this incident, and they retained all of the information that was related to him doing that.

We did not receive a request to preserve information until November 2021, twenty months after the incident, eight months

1    after this complaint was filed.

2         I believe Mr. Krotosky has been counsel of record since

3    April.  He waited until November to send us a preservation

4    letter.  We believe that that is because -- when we received

5    the letter was right after when the Bank generally ceases to

6    retain information.  We believe Mr. Brody knows that, and

7    that's the reason they delayed in requesting us to retain

8    information.

9         As to the, you know, mansion metaphor, I think it is more

10   similar to on the way to the court today if on the highway a

11   car smashed into my car and we had all the evidence to prove it

12   but then the driver said:  Well, what about the driving records

13   for every person on the highway that morning, it is just not

14   relevant.  What we produced was related to this incident and

15   what shows that Mr. Brody is the person who committed this

16   crime.

17        As to the HashiCorp bundle and subpoena 1, request 1, as

18   we have said multiple times, we have produced everything we

19   have in response to subpoena 1, request 1.

20        If Mr. Krotosky believes that that is insufficient or that

21   there's gaps in that production, we can't change what we have.

22   It is up to him to make that argument in trial.  We can't

23   produce more than what's accessible to the Bank.

24        In response to his argument about the 29 servers in boxes,

25   in our opposition we pointed out that the majority of these are

1  not servers or boxes.  In their reply they said:  "Oh, you are

2  quibbling with the term.  They are computers," and they

3  submitted an expert declaration stating that.  That's also

4  incorrect.

5      As we said in our opposition, a majority of these are

6  GitHub repositories of code, which are essentially text files.

7  There is no batch command history for a text file.  We said

8  that in our opposition.

9      We keep telling them we have provided everything we have.

10  He is talking about DevBox, you know, service -- jump boxes.

11  We provided those.  We provided what we have, and we are not

12  able to provide more than what was retained at the time of the

13  incident.

14      Overall with respect to the motion, Your Honor, it's the

15  Defendant's burden to show that the additional materials he is

16  seeking satisfy the relevancy, admissibility, and specificity

17  requirements under *U.S. v. Nixon*.  And under the *U.S. v Nixon*

18  decision if he fails to do so, his requests are unreasonable

19  and oppressive.

20      Defendant has not and cannot satisfy that burden because

21  Defendant is moving to compel First Republic Bank's compliance

22  with subpoenas that it has already fully complied with.

23      The Bank has repeatedly stated in its written responses

24  and in its motion papers that it has either produced all

25  accessible information in its possession or that it has nothing

1    responsive to produce.

2        Nevertheless, Defendant persisted in bringing this motion

3    seeking to compel the Bank to produce additional materials even

4    though the Bank has made it clear that there is nothing further

5    to produce.

6        Defendant cannot show that the additional materials

7    contained admissible evidence because the additional materials

8    either are not missing, as we showed in our opposition, or

9    Defendant is incorrect that the Bank failed to provide the

10   additional information because the Bank doesn't have additional

11   information.

12       It is not enough to hope or expect that the Bank has

13   additional relevant documents.  The Defendant must know that

14   the documents exist and describe them specifically.

15       Defendant cannot know that additional materials exist

16   because the Bank doesn't have additional materials, and he has

17   also failed to describe them specifically.

18       Defendant's motion also improperly seeks to expand the

19   scope of the already extremely broad subpoenas by identifying

20   for the first time ever additional sources of information such

21   as these so-called 29 servers in boxes and by seeking responses

22   to further interrogatory style questions that are outside the

23   scope of a Rule 17 subpoena and for which the Bank has no legal

24   obligation to respond.

25       This effort to continually expand the scope of the

subpoenas is indicative of Defendant's strategy to create doubt
about the sufficiency of the Bank's production despite the fact
that the Bank has made every effort to provide all responsive
information.

The Bank did refuse to comply with a small portion of the
more than 900 requests independent subpoenas.  For the nine
requests that seek irrelevant or privileged information, the
Bank has refused to provide responsive information.

Defendant apparently agrees with the Bank's position that
some of the requests seek irrelevant or privileged information
because he did not include four of those nine requests in his
motion to compel despite the fact that he is moving to compel
25 separate subpoena requests.

We believe Defense Counsel will never acknowledge that the
production is complete, so we are asking the Court to put an
end to this fishing expedition.

We have gone over Defendant subpoenas with the client many
times in exhausting detail.  We have repeatedly met and
conferred with Defense Counsel far before November 29th, which
was what he just said was the first time we met and conferred.
That is not accurate.

Many Bank representatives have spent a tremendous amount
of time outside of their full-time jobs scouring the Bank's
systems to provide Defendant with the requested materials.  The
Bank has no additional materials to provide.  And accordingly,

1    we respectfully request that the Court deny Defendant's motion.

2         **THE COURT:**  All right.  So you can unequivocally

3    represent to me that First Republic has no other records

4    relating to Mr. Apke's activities on March 11th and 12th; that

5    everything that the Bank would have had has been -- or that the

6    Bank does have has been produced?

7         **MR. DAVIS:**  Yes, Your Honor.  And we produced

8    Mr. Apke's command history because that's one of the two things

9    that Mr. Krotosky raised at the status conference in addition

10   to the VPN logs.

11        So after the status conference, I worked with the client

12   to make sure we had nothing further to produce in either

13   category.  We produced what we had with respect to Mr. Apke's

14   command logs, and we don't have VPN logs.  I e-mailed him; told

15   him that.  He even attached those e-mails to his motion.  Yet,

16   he is still moving to compel us to produce additional materials

17   that the Bank does not have.

18        **THE COURT:**  All right.  Thank you.  The Government is

19   not involved in this specific motion.  Is there anything that

20   you wanted to add to the discussion before I go back to

21   Mr. Krotosky.

22        **MR. HAGEMAN:**  We have nothing to add, Your Honor.

23        **THE COURT:**  Mr. Krotosky.

24        **MR. KROTOSKY:**  With respect to the command history,

25   they did produce something called a secure CRT of Mr. Apke.  It

1   has many gaps.  It is incomplete.  So our request was for them

2   to answer:  Is that all the command history that you have?  If

3   so, just let us know.  It sounds like the answer is yes, and we

4   will work with that; but it is incomplete.  And the failure to

5   preserve that does interfere with Mr. Brody's constitutional

6   rights.

7        They mentioned preservation.  Apples and oranges.  There

8   is a preservation requirement as soon as a network intrusion

9   occurs to preserve the electronic records because of their

10  ephemeral nature.  In fact, they are unable some weeks later --

11  before we even knew about this case -- to find essential

12  records.

13       Trying to determine if there was a litigation hold or some

14  other policy that applied or who decided where those records

15  went, like the bundle, that was there on whatever date that was

16  two years ago but now it's gone.  Those are essential to

17  understand as part of his defense.

18       The preservation that we sent is -- we were working very

19  collaboratively with the prior Assistant U.S. Attorney, Leif

20  Dautch, who was seeking to obtain some of those records.  And

21  when there was a delay and response that the records didn't

22  exist, as soon as we heard that, we sent the preservation,

23  which is part of the litigation process, but that's distinct

24  from the preservation requirements that apply within the days

25  and weeks, you know, following an intrusion.

1          With respect to the snapshot, it's missing the data.  It

2    doesn't have the bundle, and that's why we need those bundles,

3    as the Court, you know, already alluded to.  We looked.  It's

4    not there.

5          Now, most of the responses are, you know, we gave them

6    what was related or relevant; but the FRB shouldn't be deciding

7    what is related or relevant.  And we do not have user activity.

8    We still don't know how many users were on the network.  That's

9    a very basic question whenever there is an intrusion.  Who was

10   on there.  Let's look at all their activity, and we still don't

11   have that information for, you know, many of the categories

12   that we have requested.

13         With respect to the so-called 29 servers in boxes, we

14   identified them by name after we received the 90 gigabyte hard

15   drive.  And, you know, we expected that when we say "provide

16   the jump boxes, the DevBoxes, GitHub records," they would have

17   come.  Then we noticed this discrepancy and the gaps in the

18   evidence.

19         And that raised the question particularly if we need to

20   establish what the transmission is and what the command, code,

21   program or information is.

22         So with respect to the Defendant's burden, normally the

23   regular order is that they would move to quash.  They resisted

24   those efforts.  We had no choice to come out of the regular

25   order because we want to get this evidence.  And so that's, you

1   know, what we are forced to do in this matter.  Very unusual,

2   but we do need the evidence and we are not getting it; and we

3   believe that Mr. Brody will not fairly be able to defend

4   himself in a network intrusion case without the network

5   intrusion records and without being able to analyze each

6   transmission as to where it originated from, where it went,

7   whether it was by a command, program code or information.  And

8   because of that, you know, we believe that the records should

9   be produced.  And we thank the Court for its consideration of

10  our motion.

11          **THE COURT:**  Okay.  Thank you.

12          **MR. DAVIS:**  Thank you, Your Honor.

13          **THE COURT:**  I will get an order out on these as soon

14  as I can.  You are -- Mr. Krotosky, I think you have got the

15  documents that you have got.  And for -- and so that's the case

16  that you are going to -- that -- you are going to have to shape

17  the case with those documents.

18          And the -- I will look again at a couple of these things

19  just to be confident, but if First Republic has made

20  unequivocal representations with respect to what it has and

21  what it can produce and the Government has made clear the

22  records that it has and has given them to you, and if that is

23  insufficient to give your client a fair trial, that's an issue

24  that I imagine I will hear about and others will hear about

25  later; but this is the -- this is the case that you have got,

1    and this is the case that is going to go forward.

2           **MR. KROTOSKY:**  Yes, Your Honor.  But the question is,

3    you know, well, they say:  "We gave you what we have."

4    Normally, in the regular order, they say:  "Well, here is the

5    Bates stamp.  Here is the folder path."

6           **THE COURT:**  Mr. Krotosky, the problem with this is

7    twofold I think.  One, you supplied very broad requests and

8    insistent and ongoing requests for documents.  And First

9    Republic, instead of at the first instance saying, "No, we need

10   to have this narrowed or we need to deal with something," they

11   decided that they were going to provide everything that they

12   could.  It's -- it's a -- I don't know that it was a wise

13   choice but it was a choice.  And that's what they did.

14        And now we are where we are and you are where you are.

15   And I don't -- I'm not going to fault either side.  I'm just

16   saying we are going to trial and with -- with what we have got.

17   Okay.

18        So speaking of that, we -- does -- I'm curious whether the

19   Government -- and why don't we get Mr. Hageman and Ms. Harding

20   back up here.

21          **MR. HAGEMAN:**  Yes, Your Honor.

22          **THE COURT:**  I'm interested in what the Government's

23   expectation is with respect to time.  How long do you think it

24   is going to put your case in chief in?

25          **MR. HAGEMAN:**  May we have a moment, Your Honor.

1          **THE COURT:**  Yeah, and I'm not going to hold you to it;

2    but I have got a trial schedule that -- starting towards the

3    end of March that is going to last for quite a long time.  So I

4    really want to get a handle on how long I should be thinking

5    about for this case.

6                        (Pause in proceedings.)

7          **MR. HAGEMAN:**  Your Honor, our best estimate at this

8    point is a week to a week and a half for the Government's case

9    in chief, of course, depending on how long cross-examinations

10   take but that's our best estimate.

11         **THE COURT:**  Sure.  And, Mr. Krotosky, to the extent

12   that it's consistent with your client's interest, can you tell

13   me what I could expect for a Defense case.

14         **MR. KROTOSKY:**  Yes, Your Honor, given the short

15   days -- and I know the Court has other hearings --

16         **THE COURT:**  They seem long to me, so.

17                           (Laughter)

18         **MR. KROTOSKY:**  Yes, I appreciate that -- a week to

19   week and a half.

20         **THE COURT:**  All right.  Okay, that's helpful.  So,

21   jury selection is on April 7th; and I'm sure that that will

22   work.  I have got a trial that is starting March 27th, but that

23   case should be done in that week and certainly -- so, I might

24   have a jury out but that's -- we will do the selection on

25   April 7th.

1     The -- we will have a hearing couple of days before,

2  probably on the 5th to go over juror questionnaires and to see

3  whether the parties can agree to excuse any people who seem

4  to -- either for cause or hardship that the jury office didn't

5  see.  So we will do that and we can do that by Zoom, I think.

6  It will be the easiest way to do it.

7     So tentatively I will set that on April 5th at

8  10:00 o'clock, and then we will have the pretrial conference on

9  March 13th.

10    And you should assume for purposes of that, that my

11 tentative stands will be the order.  So assume that all the

12 Defense motions were denied.  Assume that the -- that the

13 evidence is as has been produced thus far and then go forth

14 with whatever you are going to be filing on the time schedule

15 required.

16        **MR. HAGEMAN:**  Yes, Your Honor.

17        **THE COURT:**  Okay.

18        **MR. KROTOSKY:**  Thank you, Your Honor.

19        **THE COURT:**  All right.  Thank you-all.  I will look

20 forward to seeing you again and again.

21        **MR. HAGEMAN:**  Thank you, Your Honor.

22        **MR. KROTOSKY:**  Thank you, Your Honor.

23        **THE COURT:**  Very good.  Thank you.

24            (Proceedings adjourned at 10:58 a.m.)

25                    ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, February 24, 2023

8

9

10

11    _____

12         Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25